HOLLAND & KNIGHT LLP
James H. Power *pro hac vice*
Daniel P. Kappes (SBN 303454)
50 California Street, 28th Floor
San Francisco, CA 94001
T 415.743.6900 | F 415.743.6951
E-mail: james.power@hklaw.com
E-mail: daniel.kappes@hklaw.com

Attorneys for Applicant
*Tatiana Akhmedova*

RECEIVED
SEP 16 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

FILED BY FAX

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

IN RE APPLICATION OF TATIANA AKHMEDOVA,

　　　　　　　　　　Applicant,

REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782.

Case No. CV-20-80156 MISC VKD

**DECLARATION OF ANTHONY J. RIEM IN SUPPORT OF *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

---

DECLARATION OF ANTHONY J. RIEM

## DECLARATION OF ANTHONY J. RIEM

I, ANTHONY J. RIEM, declare under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1. I am a partner of the law firm PCB Litigation LLP in London, United Kingdom. I am Applicant Tatiana Akhmedova's ("Ms. Akhmedova's", or "Applicant's") legal representative in respect of proceedings before the Courts of England and Wales, including proceedings filed by Applicant against her former husband Farkhad Akhmedov ("Farkhad"), against his alter ego entities and against their son, Temur Akhmedov ("Temur").

2. I make this Declaration in support of the application of Ms. Akhmedova, to the U.S. District Court for the Northern District of California under 28 U.S.C. § 1782 (the "1782 Application") seeking discovery with respect to documents located in the United States and in this judicial district in the possession or control of an entity called Google, LLC ("Google") for use in pending litigation in the United Kingdom (High Court of Justice, Family Division, Case No. FD13D05340) (the "English Proceeding"), which is continuing as the judgment debt awarded in December 2016 (described further below) remains almost entirely unsatisfied. The English Proceeding now also concerns fraudulent transfers by judgment debtor Farkhad Akhmedov and his alter ego entities, Cotor Investment, S.A., Qubo 1 Establishment, Qubo 2 Establishment, Straight Establishment, and Avenger Assets Corporation, including through the transfer of assets to Temur and a number of Liechtenstein trusts in the fraudulent evasion of the English Judgments entered in Applicant's favor. Ms. Akhmedova has now brought claims within these proceedings against Temur and the Liechtenstein trustee entities Counselor Trust Reg ("Counselor") and Sobaldo Establishment ("Sobaldo") (which provide trust services to a number of trusts established in Liechtenstein in furtherance of Farkhad Akhmedov's scheme) to *inter alia* set aside transfers of assets made by Farkhad Akhmedov to those parties in furtherance of his scheme of evasion. Freezing injunctions were granted by the English court against the Liechtenstein trustees (who are also subject to criminal restraint orders in Liechtenstein in aid of a money laundering investigation) in August 2019. As of July 2020, freezing injunctions and ancillary orders for disclosure (including a turnover order) were also issued by the English Court against Temur. The discovery obtained here will be used to supplement discovery

1

DECLARATION OF ANTHONY J. RIEM

sought in the English Proceeding relating to Temur's role (and the role of the Liechtenstein trustees, with whom Temur communicated) in the ongoing fraud, as more information is gathered to demonstrate that Farkhad has continued to use various third parties to transfer, hide, secrete and otherwise violate numerous court orders including a disclosure order and turnover order issued by the High Court of England and Wales.

3. I am fully authorized to make this Declaration by Ms. Akhmedova. I am fully familiar with the facts of the English Proceeding listed above as well as the various foreign proceedings between Ms. Akhmedova and Farkhad around the world. Unless stated otherwise, the statements herein are based on my personal knowledge from my involvement in Ms. Akhmedova's case, as well as my review of relevant documents in connection with proceedings pending in the United Kingdom.

**The Parties and Basic Facts**

4. The Family Division of the High Court of Justice in London (the "English Court") has awarded the Applicant an amount equal to £453,576,152 ("Judgment Debt") against Farkhad and his alter ego companies.

5. Applicant has obtained two English money judgments rendered by English Court in favor of the Applicant. One against Farkhad, Cotor Investment, S.A. ("Cotor"), Qubo 1 Establishment ("Qubo 1"), Qubo 2 Establishment ("Qubo 2"), jointly and severally, in the amount of GBP 350,000,000 plus interest and certain running adjustments (the "Cash Award"), of which £224,430,508 was designated by the English court as maintenance (the remaining GBP £125,569,492 hereinafter referred to as the "Initial Money Judgment"); and the second against Straight Establishment in the amount of $478,278,000 plus interest and certain running adjustments (the "Straight Money Judgment"). The Cash Award (including the Initial Money Judgment) was awarded in December 2016 following an eight-day Financial Remedy Hearing conducted in the Family Division of the English High Court in connection with the divorce of Applicant Ms. Akhmedova and Farkhad Akhmedov. The Straight Money Judgment was awarded by the English Court in March 2018 following Ms Akhmedova's applications against Straight Establishment and Avenger Assets Corporation ("Avenger Assets").

2

DECLARATION OF ANTHONY J. RIEM

6. Applicant issued a divorce petition in London on October 24, 2013. Ms. Akhmedova was granted a *decree nisi*, stating that the English Court saw no reason why the couple could not divorce, on December 2, 2015. The *decree nisi* was made absolute on December 15, 2016. An eight-day financial remedy hearing was heard in the Family Division of the English High Court in November and December 2016. The purpose of the Financial Remedy Hearing was to establish the value of the couple's assets and to decide how to divide that value and provide maintenance for Ms. Akhmedova in a final distribution.

7. However, on November 30, 2016 (the second day of the trial in England) a luxury yacht, the M/Y LUNA, beneficially owned by Farkhad via corporate shell (the "Vessel"), was transferred from its corporate owner, Avenger Assets, to another entity, Stern Management Corporation at the instruction of Farkhad and facilitated by his agents some of which are located in this District. One day later, on December 1, 2016, the Vessel was again transferred at the instruction of Farkhad from Stern Management Corporation to Qubo 2 with the assistance of Farkhad's agents located within this District. Later, Qubo 2 was found by the English Court to be the alter ego of Farkhad.

8. At the conclusion of the Financial Remedy Hearing on December 15, 2016, the English Court awarded Ms. Akhmedova an amount equal to £453,576,152 against Farkhad, including the Cash Award of GBP £350,000,000 (approximately US $466.6 million). Farkhad was ordered by the English Court to pay the Cash Award by January 6, 2017. A true and correct copy of the Judgment and Financial Remedy Order are attached hereto as Exhibits 1 and 2, respectively.

9. On December 20, 2016 the English Court issued a freezing order (the "Freezing Order") preventing Farkhad and the other judgment debtors from dealing with his assets (whether in or outside England and Wales), and ordering him to make financial disclosure of his assets.

10. On December 20, 2016 the English Court also found that transfers of a 1) modern art collection and 2) the assets of Cotor,[1] to entities in Liechtenstein, including Qubo 1 and Qubo 2 "was simply the latest part of [Farkhad's] attempts to avoid his liabilities by purporting to transfer his assets

---

[1] In 2012, Farkhad sold his interest in ZAO Northgas, a Russian oil company, for US $1.375 billion. Following the sale, Farkhad transferred the sale proceeds to Cotor. Ex. 1 ¶ 77.

3

to a new jurisdiction and thereby making enforcement more difficult." The English Court set aside these transfers on the basis that Qubo 1 and Qubo 2 "are no more than ciphers and the alter ego of [Farkhad]" and made the Qubo entities liable for the judgment debt together with Farkhad. Ex. 2 ¶¶ 11(g)-(h), 12.

11.     Farkhad has not voluntarily satisfied any portion of the Judgment Debt or Cash Award, including the Initial Money Judgment, and is currently in contempt of Court for breaching the terms of the Freezing Order. He has instead continued to engage in a pattern of deception aimed at concealing his assets and frustrating Ms. Akhmedova in her efforts to enforce her rights as an English judgment creditor.

12.     On March 8, 2017, in disregard of the English Judgment (under which Qubo 2 was liable on the judgment debt together with Farkhad) and pending proceedings in the Liechtenstein Court, Qubo 2 transferred the Vessel to Straight Establishment. Straight Establishment is another Liechtenstein entity, which is operated from the same address as Qubo 2. Straight Establishment is the current registered owner of the LUNA and as of August 8, 2018 Straight Establishment and its agents have been permanently enjoined from further transferring ownership, control or possession of the LUNA by the High Court of the Marshall Islands.

13.     On March 21, 2018, the English Court issued an order against Defendants Straight Establishment and Avenger Assets (the "March 21 Order"). The English Court found that Straight Establishment was an alter ego of Farkhad and served as his nominee. The English Court found that assets held and previously held in Straight Establishment's name, as well as assets held and previously held in Avenger Asset's name, beneficially belonged to Farkhad, including the Vessel which had been fraudulently transferred by Farkhad several times during the English proceedings.

14.     Also on March 21, 2108, the English Court declared "with immediate effect that [the Applicant] is the legal and beneficial owner of the Vessel," and ordered Farkhad and Straight Establishment to transfer title to Ms. Akhmedova within seven days. The English Court ordered that if the title transfer was not effected within seven days, Straight Establishment would be concurrently liable to Ms. Akhmedova for a liquidated cash sum of $487,278,000 (the "Straight Money Judgment," attached hereto as Exhibit 3). The English Court also extended the Freezing Order to apply to Straight

Establishment and Avenger Assets, and specifically applied to prohibit the "removal, disposal, charging and/or diminution in value" of the Vessel.

### I. The English Proceeding Against Temur Akhmedov

15. On 15 November 2019, Applicant filed in the ongoing English Proceeding, an application seeking to add as an additional, tenth respondent, Temur Akhmedov to the English Proceeding. Temur was joined to the proceedings by the order of Mrs. Justice Knowles dated January 20, 2020. By joining Temur as a respondent to the English Proceeding, Applicant ultimately seeks judgment against Temur in connection with certain transfers of assets made to him by Farkhad and the alter ego respondents, including but not limited to, 1) a claim for receiving over USD $100 million of Farkhad's monetary assets via fraudulent transfer, and 2) a claim for receiving the shares in a company which owned a substantial commercial property in Moscow.

16. By order of Justice Knowles dated June 19, 2020, as amended by consent (the "Disclosure Order"), Temur was required to provide standard disclosure and inspection of documents by July 17, 2020 and was also required to provide responses to Applicant's Request for Further Information ("RFI").

17. On July 17, 2020, the Applicant sought and obtained against an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure against Temur (the "WFO").

18. Also on July 17, 2020, the Temur provided disclosure and responses to the RFI pursuant to the Disclosure Order. Inspection of a limited number of documents was provided on July 17, 2020, with inspection of the majority of documents being provided on July 20, 2020.

19. Temur's disclosure statement reveals that he has previously held a wide variety of relevant documents but (on his own case) has systematically destroyed his documents since January 2018. In fact, aside from his UBS bank statements, Temur had disclosed only two documents created between April 2016 and July 20, 2020. Although Temur seeks to justify this destruction as justified by "security reasons", it appears likely that such destruction has in fact taken place in order to frustrate Tatiana's claims against him.

20. Based on Temur's acts, on July 20, 2020, Applicant applied for an order for delivery up of Temur's Electronic Devices, Mobile Communication Services and Cloud Accounts and for

5

DECLARATION OF ANTHONY J. RIEM

such Electronic Devices, Mobile Communication Services and Cloud Accounts to be imaged by an independent forensic IT expert with a view to such images being reviewed by Temur's solicitors for the purposes of verifying and, if appropriate, securing compliance with Temur's obligation to give disclosure in accordance with the Disclosure Order. A true and correct copy of the Application Notice submitted to the English Court is attached hereto as Exhibit 4.

21. In support of the July 20, 2020 Application, a witness statement in my name and signed by me was also filed. Attached hereto as Exhibit 5 is a true and correct copy of the witness statement of Anthony J. Riem dated July 20, 2020.

22. As discussed in the witness statement, Temur's disclosure gives rise to serious concerns that he has failed to comply with his disclosure obligations and/or has destroyed relevant documents in the English Proceeding. In particular, in a document submitted by Temur, he expressly states that a number of documents which ought to be disclosed are no longer in his control because they were stored on "mobile devices, on computers and/or on solid-state drives, to which I no longer have access by reason that they have been destroyed". It is also said that "Increasingly, since January 2018 on professional advice, I have adopted a practice of periodically destroying mobile devices and computer storage for security reasons". The same is said in respect of communications contained on "electronic storage". Accordingly, it appears to be Temur's case that he has destroyed virtually every document which is relevant to these proceedings created since 1 March 2016. Ex. 5 ¶ 10(b).

23. As I represented to the English Court, it remains implausible that all of Temur's documents from March 2016 have, on a regular basis, been completely obliterated (which appears to follow from the disclosure Temur has given). This would mean, amongst other things, that Temur has permanently deleted all such documents (without keeping any record, even in a secure environment) and that he cannot retrieve them even for his own legitimate purposes. It is not credible that any person could operate in a way that means that they have no access to any documents or information relating to past dealings. Ex. 5 ¶ 10(d).

24. To the contrary, there is compelling evidence that Temur had not in fact routinely destroyed the documents over the previous years but that the deletions are recent (and, it must be inferred, triggered by a desire to avoid giving disclosure in the English Proceeding). For example:

6

DECLARATION OF ANTHONY J. RIEM

a. When the application for disclosure was heard by the court in May 2020, and the court was considering the appropriate scope of disclosure to be ordered, Temur's counsel did not advise the court that he held no documents because they had all already been destroyed.

b. As noted in (Ex. 5) at ¶ 11d, Temur disclosed two emails sent to him (at his personal Gmail account) dated October 2013. Temur has since produced the native copies of these emails as forwarded by him to his solicitors. It is now apparent that these were forwarded from Temur's khyshen@gmail.com account to Mr Harper of HFC in January 2020. On Temur's case, these emails ought not to exist because they would have been the subject of routine destruction. But they undeniably did exist as of 19 January 2020. Temur is now forced into the absurd position that "he had expected to find [those emails] on his PC, and believes that they are stored on it, but so far has not found them". There is an overwhelming inference that Temur did hold his emails as of 19 January 2020 but either (a) is lying about no longer holding them, or (b) has destroyed them since that date.

c. As I explain in ¶31 below, when independent forensic experts appointed by the English Court attempted to access Temur's email account, hosted by Google, at temur@stecapital.net on 14 August 2020, Google presented a message advising that the account had been *"recently deleted"*. This message had not appeared when attempts were made to access the account less than 2 weeks earlier. It therefore appears that Temur has been setting about deleting his email accounts in response to the orders of the English Court.

25. In addition to Temur's express statements that *prima facie* disclosable documents have been destroyed, there are further obvious gaps and inconsistencies in his disclosure as set forth in my witness statement (Ex. 5) at ¶ 11.

26. Based on the submission made to the English Court, the Court issued an Order on July 23, 2020 directing that Temur shall by July 27, 2020 deliver up his electronic devices including all usernames, passwords and pin numbers for access to Temur's electronic devices, cloud accounts and

7

DECLARATION OF ANTHONY J. RIEM

mobile communications services. Temur was also directed to cooperate with the independent IT forensic expert (Stroz Freiberg Limited, a subsidiary of Aon ("Aon")) to access, decrypt and examine the relevant data. A true and correct copy of the English Order dated July 23, 2020 is attached hereto as Exhibit 6.

27. However, Temur failed to provide access to any of his Cloud Accounts or Mobile Communication Services (as defined by the order) and failed to deliver up any of his Electronic Devices. In summary:

*Cloud Accounts and Mobile Communication Services*

28. Temur was required to provide by noon on 27 July 2020 a list verified by statement of truth "of all Cloud Accounts and Mobile Communication Services used by him since 1 January 2013, identifying the applicable user-name, e-mail address or telephone number for each such service". On 28 July 2020 Temur provided a statement identifying the following Cloud Accounts and Mobile Communication Services used since 1 January 2013:

a. Email accounts:
    i. temur@akhmedov.net
    ii. temur@stecapital.net
    iii. kyyshen@gmail.com
    iv. temur.akhmedov1993@gmail.com
b. Phone numbers:
    i. +447795973199
    ii. +447554021056
    iii. +447900434912
    iv. +19543283389
    v. +447739961849
    vi. +12022270009
    vii. +447833305807
c. Communication services
d. Signal – registered to *5807 number above

8

DECLARATION OF ANTHONY J. RIEM

    e.   Telegram – registered to *3199 number above

    f.   Instagram – usernames: sexy_temur123456789 and ttxx___

    g.   iMessage – registered to *3199 number above

    h.   Whatsapp – registered to 077959731991

29. Temur was then required by paragraph 8(b) to provide Aon with "all PIN numbers, user-names, email addresses, combinations, passwords, security verification codes and any other item or piece of information (including, without limitation, authorisations to third party service providers) which may be necessary to give access to the Electronic Devices, Cloud Accounts or Mobile Communication Services".

30. However, Aon was unable to access any of the accounts listed above using the credentials provided by Temur. In particular, for three of the four email accounts Aon received messages from the service providers reporting that the password provided was incorrect.

31. On 14 August 2020, Alex Campbell (of Aon) contacted Temur to undertake Google's account recovery process with him for each of his four Google accounts. This was unsuccessful for each account due *inter alia* to Temur claiming not to be in possession of back-up passcodes or devices registered for authentication, or even to be able to identify his mobile phone number registered with Google for recovery purposes when provided with part of the phone number. I note in particular that in relation to the temur@stecapital.net account, Mr. Campbell summarised as follows (emphasis added):

*When entering the email address 'temur[at]stecapital.net' into the Google login page and pressing next, we would expect to be presented with a screen containing a password prompt. Instead, we were presented with a screen stating that "This account was recently deleted and may be recoverable. Click Next to attempt to restore this account."*

*[...]*

*Notably, when we attempted to access the 'temur[at]stecapital.net' email account on 7th August 2020 using credentials supplied by Mr. Akhmedov, we were not presented with the "This account was recently deleted..." message. Instead, we were prompted to enter a password for the account, which when entered, was unsuccessful. This suggests that the*

9

>*'temur[at]stecapital.net' account was deleted sometime between 7th August 2020 when we attempted to access the account, and our call today...*

32. Aon advised that this email account and its data might still be recoverable if steps were taken promptly and so Mr. Campbell has sought further assistance from Temur. However, Temur has stated that he is unable to cooperate, as he is unable to remember any details which would enable his accounts to be recovered (including passwords, and the phone number provided to Google for account verification purposes). Aon is concerned that the continued delay in accessing the temur@stecapital.net account risks the account becoming unrecoverable and the data lost.

*Electronic Devices*

33. Pursuant to paragraphs 9(a) and 9(b) of the 23 July 2020 Order Temur was required to provide his desktop PC (which he said had been taken to Turkey by a friend) to Aon by 31 July 2020 and the rest of the Electronic Devices as defined by the order (which were said to be with him in France) by the earlier date of 28 July 2020.

34. However, Temur deliberately delayed in sending his Electronic Devices other than the desktop PC (i.e. the devices already within his possession in France) until 28 July 2020, causing inevitable breach of the paragraph 9(b) deadline. The delay was apparently explained by the fact that, he claimed, he had chosen to recover his desktop PC from Turkey to France, before sending all of his devices together. He offered no explanation for why he had chosen to breach the court's order by not sending his other Electronic Devices immediately so that they would arrive by the deadline fixed by the court. This result of his actions was that Temur claims to have sent all of the Electronic Devices in one package (said to contain an Apple iPhone telephone, an Apple Mac book, a personal desktop computer with solid state drive storage, and an Apple watch).

35. On 31 July 2020 DHL (the courier service engaged by Temur) confirmed that their systems showed that a package (with waybill No. 8981637814) had been collected by DHL from Temur's address in France on 13:09pm on 28 July 2020. However, they noted that they had no "scans" on their system showing any progress after collection. On 7 August 2020 DHL advised Aon that its warehouse CCTV footage did not show the package being delivered to the warehouse, and that the warehouse has been searched and the package has not been located. Following that

DECLARATION OF ANTHONY J. RIEM

investigation, DHL advised that it considered the package to have been lost with the reason unknown. On 14 August 2020 DHL advised Aon that it was planning to lodge a complaint with the police following the loss of the shipment.

36. Whilst Temur blames DHL for this situation, it is a remarkable coincidence (particularly after all of Temur's devices were supposedly combined into a single package, even though that required a breach of the court's order). Accordingly, all Temur's Electronic Devices (including the PC) are currently missing.

*2019 iPhone Image*

37. On 31 July 2020, Temur served an updated List of documents (N265) explaining that he had searched for electronic documents on a digital image of his mobile telephone and laptop computer created in November 2019. He failed to produce the image to Aon on 28 July 2020, instead telling Aon on that date that he did not know where it was. Three days later, on 31 July 2020 Temur's solicitors said that "[t]he image taken of our client's iPhone in November 2019 (when he became aware of this proceedings) is not caught by the terms of the Forensic Examination Order. However, our client will in any event produce it to Aon."

38. Despite this, Temur did not provide any image to Aon and Ms. Akhmedova was therefore forced to apply to Court for a further order for delivery up. By the Order of Mrs. Justice Knowles dated 10 August 2020 Temur was ordered to deliver up the digital image of his mobile telephone and laptop computer created in November 2019 to Aon by 12 August 2020. A true and correct copy of the English Order dated August 10, 2020 is attached hereto as Exhibit 7.

39. I understand that an image of the iPhone was eventually provided to Aon on 14 August 2020 and has been analysed. Despite stating in his updated List of documents (N265) dated 31 July 2020 that he had searched a "digital image of my mobile telephone and laptop computer, created in November 2019", Temur now says that a digital image of his laptop was never obtained, and that he therefore cannot deliver up a copy.

40. Pursuant to the Forensic Examination Order, an expert report by Aon on the contents of the iPhone image has been prepared and was sent to Temur's solicitors (to undertake a review for any privileged material) on 4 September 2020, to be shared (with any necessary redactions) with

11

DECLARATION OF ANTHONY J. RIEM

Tatiana's solicitors on 11 September 2020. However, as at the time this declaration was executed, no report had been shared.

*Google Mandates*

41. The terms of the Order of Mrs. Justice Knowles dated 10 August 2020 also provided that Temur would "forthwith execute by hand and deliver to the Applicant's solicitors a mandate for each of his email accounts in the form attached in the Schedule to this Order authorising and directing Google (and associated companies) to provide Aon with access to and/or with copies of the Tenth Respondent's accounts and any emails, documents, other electronic data and metadata held on those accounts. The Tenth Respondent shall provide such further assistance and execute such further documents as may reasonably be required to give effect to the mandates." Ex. 7.

42. As Temur failed to execute the mandates provided and on 24 August 2020, Ms. Akhmedova applied for an order that the mandates be provided by 4pm on 26 August 2020. That order was granted by Mrs. Justice Knowles on 26 August 2020. Temur did not comply with that order. A true and correct copy of the English Order dated August 26, 2020 is attached hereto as Exhibit 8.

43. Copies of the mandates signed by Temur were eventually provided on 3 September 2020 (true and correct copies of which are attached hereto as Exhibit 9). I note however that Temur remains in breach of his obligations at paragraphs 8(b) and (c) of the English Order dated August 26, 2020 requiring him to (i) provide complete answers to Aon's outstanding questions dated 14 August 2020 (in relation to matters set out at paragraphs 31-32 above), and (ii) to produce his unredacted UBS bank statements for January 2014 to 31 December 2018. On 7 September 2020, Justice Knowles ruled that Temur had provided no good reason for his non-compliance with those orders and set a further deadline for compliance of 10am on Thursday 10 September. On 10 September 2020, Temur (through his solicitors) provided a partial response to these questions, noting (relevantly) that his solicitors had been "unable to make any progress in recovering the account as our client does not have the google authenticator app, he does not have an 8-digit back up code, he did not know which phone number he provided in his security settings and he does not know the recover email address that he added to his account".

DECLARATION OF ANTHONY J. RIEM

44. I understand that the mandates executed by Temur in the English Proceeding consenting the disclosure of information by Google are sufficient to allow Google to make the requested production, including electronic communications maintained in the accounts, under an exception to disclosure under the Electronic Communications Privacy Act, at 18 U.S.C. § 2702(b)(3).

*The role of Aon in the English Proceeding and this Application*

45. This Application seeks an order for production to Aon, in its role as court-appointed independent IT forensic expert in the English Proceeding (as set out above at paragraph 26).

46. Aon are subject to an undertaking as to confidentiality (see (Ex. 6) at ¶ 4 of Schedule 1). Any information received by Aon pursuant to this Application will be treated as having been received pursuant to the Forensic Examination Order. As such, the English court has put in place a process by which Temur's solicitors (as officers of the court) will review and provide only relevant documents to the Applicant (as set out in set out in paragraph 40 above, in relation to the iPhone Image). As a result, the Applicant will not receive any irrelevant, or privileged emails on Temur's Google accounts.

47. The Application therefore assists Aon to recover the relevant data in Temur's Google accounts (which are, Temur says, otherwise irrecoverable), for the purposes of performing its functions in this role.

**Applicant's Request for Discovery Pursuant to 28 U.S.C. § 1782**

48. Under the circumstances, the following categories of evidence will be relevant, important and useful to Ms. Akhmedova's adjudication of the English proceedings against Temur Akhmedov as set forth above, all of which evidence is located in the United States in the possession and control of Google:

    a) All non-content electronically stored information ("ESI"), including but not limited to all metadata and subscriber information for the following email accounts:

        i) temur@akhmedov.net;

        ii) temur@stecapital.net;

        iii) khyshen@gmail.com;

        iv) temur.akhmedov@gmail.com;

DECLARATION OF ANTHONY J. RIEM

   v)   any other email address where Temur Akhmedov is determined to be the subscriber or account holder;

 b)   All emails, documents or information regarding the above-listed accounts which would ordinarily be recoverable to a subscriber or account holder through the account recovery process with Google or based on the consent of the subscriber or account holder.

49.   Upon information and belief, Google has control and access to all of the above information within this District.

50.   None of the information requested has been made available to Applicant and is not available to Applicant within the United Kingdom, as Google does not maintain a principal place of business and cannot be served there. The company's headquarters is located in this District. Nor would granting the assistance requested by Ms. Akhmedova offend any foreign jurisdiction or constitute a circumvention of foreign proof-gathering rules. There is no English rule of evidence that would prevent discovery obtained under 28 U.S.C. § 1782 being used in the English proceedings.

51.   Under the circumstances, evidence that will be relevant to Ms. Akhmedova's entitlement to relief in the English proceedings is not available in United Kingdom but is located in the United States in this District.

52.   As such, Applicant respectfully requests the Court grant her request for discovery pursuant to 28 U.S.C. § 1782.

I declare under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief.

Dated:    London, United Kingdom

     September 14, 2020

                _/s/ Anthony J. Riem_
                Anthony J. Riem