# EXHIBIT 1



Neutral Citation Number: [2016] EWHC 3234 (Fam)

Case No: FD13D05340

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15/12/2016

Before :

MR JUSTICE HADDON-CAVE
- - - - - - - - - - - - - - - - - - - - -
Between :

| | |
|---|---|
| TATIANA AKHMEDOVA | Applicant |
| - and - | |
| FARKHAD AKHMEDOV | Respondent |
| WOODBLADE LTD | 2nd Respondent |
| COTOR INVESTMENT SA | 3rd Respondent |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Mr Nigel Dyer QC, Mr Dakis Hagen and Mr Henry Clayton of Counsel (instructed by
Payne Hicks Beach) for the Applicant
The Respondents were not present or represented

Hearing dates: 29 and 30 November 2016, 2, 5, and 15 December 2016
- - - - - - - - - - - - - - - - - - - - -

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

..............................

MR JUSTICE HADDON-CAVE

This judgment was delivered in private.   The judge has given leave for this version of the
judgment to be published on condition that (irrespective of what is contained in the judgment)
in any published version of the judgment the anonymity of the children and members of their
family must be strictly preserved.   All persons, including representatives of the media, must
ensure that this condition is strictly complied with.   Failure to do so will be a contempt of
court.

Mr Justice Haddon-Cave:

## INTRODUCTION

1.  The Applicant, Mrs Tatiana Akhmedova ("W"), applies for financial orders ancillary to her divorce from the Respondent, Mr Farkhad Akhmedov ("H").

2.  The 2nd Respondent ("Woodblade") is a Cypriot registered company and the trustee of a Bermudian trust, the Akhmedov 2013 Discretionary Trust ("the Trust"). H is the sole director of Woodblade. The 3rd Respondent, Cotor Investment SA, ("Cotor") is a Panamanian company which H contends is within the Trust. Cotor is said to hold the bulk of the wealth in this case. Woodblade and Cotor were joined to these proceedings by order of Mr Justice Moor on 25th October 2016.

3.  W's divorce petition was issued on 24th October 2013. H initially sought a stay of W's divorce proceedings on *forum non conveniens* grounds, in favour of a divorce petition that he had issued in Moscow in February 2014. Subsequently, H withdrew his application for a stay and by letter from his solicitors, Sears Tooth, dated 18th June 2015, submitted to the jurisdiction. W's petition has since proceeded as an uncontested suit. A Decree Nisi was granted on 2nd December 2015.

*Respondents' non-appearance at the trial*

4.  A trial of this matter commenced before me in the Queen's Building at the Royal Courts of Justice on 28th November 2016. None of the Respondents appeared or were represented at any stage during the trial. In particular, H failed to appear at the trial in person in breach of orders made by the Court on 27th November 2015, 11th April 2015 and 25th October 2016 (and a promise by Leading Counsel at the Pre-Trial Review hearing on the latter date).

5.  On 15th November 2016, H's long-standing matrimonial solicitors, Sears Tooth, wrote to W's solicitors, Payne Hicks Beach ("PHB"), informing them that they had come off the record. On 21st November 2016, PHB, wrote to Sears Tooth inquiring whether H intended to play any part in the trial but received no reply. H has never, in fact, appeared in person at any hearing during these matrimonial proceedings. H was ordered to attend the Financial Dispute Resolution hearing on 11th April 2015, but shortly before the hearing, informed the Court that he had lost his passport containing his English visa. He attended by video-link from his yacht, *M/Y Luna*, from the Caribbean.

6.  Woodblade and Cotor have played no part in the trial and have at no stage acknowledged or responded to the proceeding or the case made against them by W.

7.  I am satisfied that service of these proceedings and notice of the trial was properly effected on H, Woodblade and Cotor (see further below).

*Breach of orders*

8. H is presently in breach of numerous Court orders. In particular, H has failed to comply with the following Orders of the Court:

    (1) Holman J's Orders made on 18th May 2016 ordering H: (i) to provide documents and reports in his possession concerning the historic value of Northgas, and any written offers to buy the business; (ii) to allow the jointly instructed valuer, Savills, access to the properties in Russia; (iii) to provide his open settlement offer; (iv) to comply with the orders compelling his personal attendance for the duration of the trial.

    (2) Moor J's Order made at the Pre-Trial Review ("PTR") on 25th October 2016: (i) to provide a written reply to W's trust Case (paragraph 8); (ii) to provide up-dating disclosure (paragraph 10); (iii) to pay the cost of the chattels valuation (paragraph 13); (iv) to pay the costs order (paragraph 21); and (v) to comply with previous orders compelling his (and W's) personal attendance for the duration of the trial (paragraph 18).

*W's representation*

9. W has been represented throughout the trial by Mr Dyer QC, Mr Hagen and Mr Clayton of Counsel, for whose assistance I am grateful. Counsel are instructed by W's solicitors, The Baroness Shackleton and Mr Ian Connell of PHB.

## BACKGROUND

10. H was born on 15th September 1955 in Azerbaijan, which was then part of the Soviet Union (and is now aged 61). W was born on 26th July 1972 in Hungary and grew up in Russia (and is now aged 44).

11. W and H met in 1989 when she studying in Moscow. W was aged 17 at the time and H was aged 34. H had been married twice before. H and W married on 29th July 1993 in Moscow when W was pregnant with her elder son, Temur.

12. In 1993, H and W moved to London. They lived in Hampstead at 3 Elm Walk, which H had purchased. Temur was born in London in September 1993. In 1994, H bought a holiday property in France, *Villa le Cottage* at St Jean Cap Ferrat. In June 1996, their younger son, Edgar, was born in Monaco. In September 1996, H purchased *Somerton House* at St George's Hill in Surrey and the family moved there.

13. H worked in London as an oil and gas trader and began to travel a great deal. H became very successful in pursuing business interests in the gas sector in Russia through a Russian company called ZAO Northgas ("Northgas"). In November 2012, H sold his shares in Northgas for US$1.375 billion.

14. W has been a housewife and mother throughout the marriage. W was a 'hands-on' mother who cared for and brought up the boys herself in Surrey, without the assistance of a nanny. W also helped to care for H's child from his first marriage, Anna, who came over to live and go to school in England. The boys were educated in various

private day schools in Surrey. Their secondary education was at Cranleigh School, where they were day-boys. They went to university in London. Temur (now aged 23) and Edgar (now aged 20) are both British citizens. The boys have visited Russia but have never lived there. In 2013, H bought Temur and Edgar flats in London at the One Hyde Park development costing £29 million and £7.2 million respectively.

15. W still lives in the former matrimonial home, *Somerton House*. It was transferred by H into her sole name in 2013. She was granted Indefinite Leave to Remain in the UK in 1994 and became a British citizen on 27th October 2000. H also has Indefinite Leave to Remain in the UK.

16. I set out my detailed findings of fact below.

*W's case*

17. W contends that the total net marital wealth in this case is just over £1 billion, *i.e.* £1,092,334,626 to be precise (see the attached Schedule of Assets). W contends that the entire wealth in this case is matrimonial in character, that is to say that this wealth was acquired and built up during the long marriage by the parties' equal contributions to the welfare of the family, and which should be subject to the sharing principle (see further below).

*Respondent's case*

18. The non-appearance of H and the 2nd and 3rd Respondent at the trial has meant that the Court has not had the benefit of hearing any evidence or submissions from them. The reason for H's sudden decision, two weeks before the trial, no longer to contest the proceedings is unclear. It may be that, following Moor J's order on 25th October 2016 joining Woodblade and Cotor and requiring disclosure, H felt that he had no real answer to W's claim.

19. The Court has studied the documents and witness statements previously lodged by H. The Court has also had the assistance of Mr Dyer QC, Mr Hagen and Mr Clayton in identifying points which H, Woodblade and Cotor might have made if they had appeared at the trial. There would appear to be five principal contentions which might be made, in particular by H, in defence of W's claim. First, that H was wealthy before the parties married in 1993. Second, that H made a special contribution to the creation of the wealth through his work with Northgas. Third, that the marriage broke down in 1999 or 2004, *i.e.* well before he sold the Northgas shares. Fourth, that the value of the assets at that time was far below that asserted by W and, in particular, the Northgas shares were unsaleable or worthless. Fifth, that, in any event, the majority of assets were held in trusts of which H is a mere discretionary beneficiary.

MR JUSTICE HADDON-CAVE
Approved Judgment

Akhmedova v Akmedov and ors

## ISSUES

20.    The issues in the case and the structure of this judgment can be summarised as follows:

### THE LAW

#### DEPARTURE POINTS:
(1)   Was there pre-marital wealth?
(2)   When did the parties separate?
(3)   Did H make a special or stellar contribution?

#### COMPUTATION OF THE MARITAL ASSETS:
(4)   What is the value of the available assets?
(5)   What are the trust issues?.   .

#### DISTRIBUTION:
(6)   What is a fair division of the marital assets?

#### ANCILLARY MATTERS:
(7)   Service
(8)   Lugano Convention

### CONCLUSION AND ORDER

## THE LAW

21.    I direct myself in relation to the relevant law as regards financial remedy claims which I summarise below.

22.    The power to make ancillary financial orders in a divorce is statutory and is contained in sections 23-25 of the Matrimonial Causes Act 1973 ("MCA 1973").   For convenience, I set out the key provisions:

> *"23. Financial provision orders in connection with divorce proceedings, etc.*
>
> *(1) On granting a decree of divorce, a decree of nullity of marriage or a decree of judicial separation or at any time thereafter (whether, in the case of a decree of divorce or of nullity of marriage, before or after the decree is made absolute), the court may make any one or more of the following orders, that is to say—*
>
> *(a) an order that either party to the marriage shall make to the other such periodical payments, for such term, as may be specified in the order;*
>
> *(b) an order that either party to the marriage shall secure to the other to the satisfaction of the court such periodical payments, for such term, as may be so specified;*
>
> *(c) an order that either party to the marriage shall pay to the other such lump sum or sums as may be so specified;*

9

(d) an order that a party to the marriage shall make to such person as may be specified in the order for the benefit of a child of the family, or to such a child, such periodical payments, for such term, as may be so specified;

(e) an order that a party to the marriage shall secure to such person as may be so specified for the benefit of such a child, or to such a child, to the satisfaction of the court, such periodical payments, for such term, as may be so specified;

(f) an order that a party to the marriage shall pay to such person as may be so specified for the benefit of such a child, or to such a child, such lump sum as may be so specified;

subject, however, in the case of an order under paragraph (d), (e) or (f) above, to the restrictions imposed by section 29(1) and (3) below on the making of financial provision orders in favour of children who have attained the age of eighteen."

"24. Property adjustment orders in connection with divorce proceedings, etc.

(1) On granting a decree of divorce, a decree of nullity of marriage or a decree of judicial separation or at any time thereafter (whether, in the case of a decree of divorce or of nullity of marriage, before or after the decree is made absolute), the court may make any one or more of the following orders, that is to say—

(a) an order that a party to the marriage shall transfer to the other party, to any child of the family or to such person as may be specified in the order for the benefit of such a child such property as may be so specified, being property to which the first-mentioned party is entitled, either in possession or reversion;

(b) an order that a settlement of such property as may be so specified, being property to which a party to the marriage is so entitled, be made to the satisfaction of the court for the benefit of the other party to the marriage and of the children of the family or either or any of them;

(c) an order varying for the benefit of the parties to the marriage and of the children of the family or either or any of them any ante-nuptial or post-nuptial settlement (including such a settlement made by will or codicil) made on the parties to the marriage ,other than one in the form of a pension arrangement (within the meaning of section 25D below);

(d) an order extinguishing or reducing the interest of either of the parties to the marriage under any such settlement, other than one in the form of a pension arrangement (within the meaning of section 25D below);

subject, however, in the case of an order under paragraph (a) above, to the restrictions imposed by section 29(1) and (3) below on the making of orders for a transfer of property in favour of children who have attained the age of eighteen.

*(2) The court may make an order under subsection (1)(c) above notwithstanding that there are no children of the family.*

*(3) Without prejudice to the power to give a direction under section 30 below for the settlement of an instrument by conveyancing counsel, where an order is made under this section on or after granting a decree of divorce or nullity of marriage, neither the order nor any settlement made in pursuance of the order shall take effect unless the decree has been made absolute."*

*"25. Matters to which court is to have regard in deciding how to exercise its powers under ss. 23, 24 and 24A.*

*(1) It shall be the duty of the court in deciding whether to exercise its powers under section 23, 24 , 24A or 24B above and, if so, in what manner, to have regard to all the circumstances of the case, first consideration being given to the welfare while a minor of any child of the family who has not attained the age of eighteen.*

*(2) As regards the exercise of the powers of the court under section 23(1)(a), (b) or (c), 24 , 24A or 24B above in relation to a party to the marriage, the court shall in particular have regard to the following matters—*

*(a) the income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future, including in the case of earning capacity any increase in that capacity which it would in the opinion of the court be reasonable to expect a party to the marriage to take steps to acquire;*

*(b) the financial needs, obligations and responsibilities which each of the parties to the marriage has or is likely to have in the foreseeable future;*

*(c) the standard of living enjoyed by the family before the breakdown of the marriage;*

*(d) the age of each party to the marriage and the duration of the marriage;*

*(e) any physical or mental disability of either of the parties to the marriage;*

*(f) the contributions which each of the parties has made or is likely in the foreseeable future to make to the welfare of the family, including any contribution by looking after the home or caring for the family;*

*(g) the conduct of each of the parties, if that conduct is such that it would in the opinion of the court be inequitable to disregard it;*

*(h) in the case of proceedings for divorce or nullity of marriage, the value to each of the parties to the marriage of any benefit . . . which, by reason of the dissolution or annulment of the marriage, that party will lose the chance of acquiring."*

23.   In exercising its wide discretionary powers, the Court must have regard to all the circumstances of the case as well as certain particular matters.   In addition to giving

11

first consideration to any minor child of the family who has not attained the age of 18, the Court must have regard in particular to: (i) the parties' resources, (ii) the parties' needs, (iii) standard of living enjoyed by the family before the breakdown of the marriage, (iv) the age of each party and duration of the marriage, (v) disabilities, (vi) contributions which each of the parties has made or is likely in the foreseeable future to make to the welfare of the family, including any contribution by looking after the home or caring for the family, (vii) conduct of each of the parties, if that conduct is such that it would in the opinion of the court be inequitable to disregard it, and (viii) benefits lost by reason of dissolution of the marriage, e.g. pension rights, death-in-service, insurance cover.

24.  In practice, there are two stages to the analysis: (a) **Computation**, i.e. assessing the available resources (by reference to a Schedule of Assets); and (b) **Distribution**, i.e. determining each party's share, and the form the orders will take (e.g. lump sum and/or property transfer).

*Computation – General principles*

25.  A computation of a party's resources includes not only assets beneficially owned by the party, but assets which he or she is likely to receive from a third party (e.g. a trustee) if he or she asked for them. Thus, the legal question is: if a discretionary beneficiary were to request the trustee to advance the whole or part of the capital to him, would the trustee would be likely to do so now or in the foreseeable future? (known as "the *Charman* test") (see *Charman v Charman* [2006] 1 WLR 1053 at [12]).

26.  The question is not one of control of resources: it is one of access to them. As Lewison J explained in *Whaley v Whaley* [2011] EWCA Civ 617 at [113]:

> "...[A] discretionary beneficiary has no proprietary interest in the fund. But under s 25 of the 1973 Act the court looks at resources; not just at ownership. Thus whether a beneficiary under a discretionary trust has a proprietary interest is not relevant. The resource must be one that is 'likely' to be available. This is the origin of the likelihood test. No judge can make a positive finding about the future: the best that can be done is to assess the likelihood. What is relevant is the likelihood of the trust funds or part of it being made available to him, either by income or capital distributions. If the husband were to ask the trustees to advance him capital, would the trustees be likely to do so: Charman v Charman [2005] EWCA Civ 1606, [2006] 2 FLR 422; A v A [2007] EWHC 99 (Fam), [2007] 2 FLR 467? The question is not one of control of resources: it is one of access to them."

*Distribution – General principles*

27.  The general principles applicable to distribution can be summarised as follows (in the light of *White v. White* [2000] 2 FLR 981, *Miller v. Miller, McFarlane v. McFarlane* [2000] 1 FLR and *Charman v Charman (No. 4)* [2007] 2 FLR 1246):

(1)  In deciding how the assets should be distributed, the court's overall objective is *"fairness"* (per Lord Nicholls in White at [983]).

(2)  The concept of *"fairness"* is not to be applied in an overly subjective way, but must be checked against 'the yardstick of equality': *"As a general guide, equality should be departed from only if, and to the extent that, there is good reason for doing so"* (per Lord Nicholls in <u>White</u> at [989]; and see <u>In Charman (No 4)</u> at [65]).

(3)  There is no place for discrimination between husband and wife and their respective roles: *"If, in their different spheres, each contributed equally to the family, then in principle it matters not which of them earned the money and built up the assets"* (per Lord Nicholls in <u>White</u> at [989]).

(4)  The rationale for the equal sharing is not largesse but logic: *"Each party to a marriage is entitled to a fair share of the available property"* (per Lord Nicholls in <u>Miller; McFarlane</u> at [9]).

(5)  In conducting its enquiry into the parties' assets, the Court will consider whether the assets represent matrimonial property, or non-matrimonial property (*i.e.* the product of the parties' common endeavour during the marriage or from sources external to the marriage). ·

(6)  The principle of sharing applies to all the parties' property, but, to the extent that their property is non-matrimonial, *"there is likely to be better reason for departure from the principle of equality"* (see <u>In Charman (No 4)</u> at [66]).

(7)  The circumstances in which the Court may depart from the principle of equal 50:50 sharing may include the following (known as 'departure points'): (a) where assets pre-date the parties' marriage (*i.e.* there is non-matrimonial property); (b) the receipt of inherited property, or gifts from sources external to the marriage (*i.e.* non-matrimonial property), in both cases which are not 'mixed and mingled' with matrimonial property; (c) special or 'stellar' contributions during the marriage; (d) post-separation accrual of assets; and (e) post-separation contribution which is unmatched by the other spouse.

(8)  The date by which the marital acquest (*i.e.* the property built up during the marriage) is measured is usually the date of separation, although there will be circumstances in which post-separation accrual will be treated as matrimonial property (*e.g.* passive growth on a matrimonial asset) (per Lord Mance in *Miller;McFarlane* at [174]).

28.  The threshold for relevant *"conduct"* in s.25(2)(g) is very high (see Lord Nicolls and Lady Hale in <u>Miller</u> at [59]-[65]).  Adultery is immaterial to the amount of financial provision that is ordered and does not comprise *"conduct which it would be inequitable to disregard"* within the meaning of s.25(2)(g).  As Coleridge J warned in <u>G v. G (Financial Provision: equal division)</u> [2002] 2 FLR 1143:

> "... [T]he parties are not assisted to achieve compromise when they are encouraged by the law to indulge in a detailed and lengthy retrospective involving a general rummage through the attic of their marriage to discover relics from the past to enhance their role or diminish their spouse's."

29. There can be difficulties with identifying how much of an asset is matrimonial and non-matrimonial. Passive growth does not change the character of the property, but growth as a result of activity during the marriage may do so. Issues may arise as to whether post-separation accrual could be described as 'a continuum' or 'new ventures' (per Roberts J in *Cooper-Hohn v. Cooper Hohn* [2015] 1 FLR 745; and see *JL v SL* at [42]) (And see further below).

*Special or 'stellar' contribution*

30. Special or 'stellar' contribution is a very narrow concept (and may not survive the appeal in *Gray v Work* [2015] EWHC 834 due to be heard in February 2017). In *Gray v Work*, Holman J usefully distilled the following principles from *Miller* and *Charman*:

> "(i) The characteristics or circumstances which would result in a departure from equality have to be of a wholly exceptional nature such that it would very obviously be inconsistent with the objective of achieving fairness for them to be ignored: per Bodey J in Lambert but quoted with obvious approbation by Lord Nicholls of Birkenhead in Miller at paragraph 68.
>
> (ii) Exceptional earnings are to be regarded as a factor pointing away from equality of division when, but only when, it would be inequitable to proceed otherwise (Lord Nicholls of Birkenhead in Miller at paragraph 68).
>
> (iii) Only if there is such a disparity in their respective contributions to the welfare of the family that it would be inequitable to disregard it should this be taken into account in determining their shares (Baroness Hale of Richmond, in Miller at paragraph 146).
>
> (iv) It is extremely important to avoid discrimination against the home-maker (the Court of Appeal in Charman at paragraphs 79 and 80).
>
> (v) A special contribution requires a contribution by one unmatched by the other (the Court of Appeal in Charman at paragraph 79).
>
> (vi) The amount of the wealth alone may be so extraordinary as to make it easy for the party who generated it to claim an exceptional and individual quality which deserves special treatment. Often, however, he or she will need independently to establish such a quality, whether by genius in business or some other field (the Court of Appeal in Charman at paragraph 80). A windfall is not enough.
>
> (vii) There is no identified threshold for such a claim to succeed. (the Court of Appeal in Charman at paragraph 88)."

31. Sir Mark Potter P observed in *Charman No.4* at [90]) that fair allowance for special contribution within the sharing principle would be *"most unlikely to give rise to*

14

*percentages of division of matrimonial property further from equality than 66.6%-33.3%".*

32.   There have been only three reported cases in which a party has succeeded in arguing special contribution: *Sorrell v. Sorrell [2005] EWHC 1717, Charman v Charman* [2005] EWCA Civ 1606 (where it was conceded), and *Cooper-Hohn v. Cooper Hohn* [2015] 1 FLR 745. In *Cooper-Hohn*, the wife received an award of US$530 million from the available assets of just under US$1.5 billion. The husband had generated $6 billion through his business during the marriage (of which $4.5bn had be placed in a charitable trust). The post separation accrual was $550 million (see [300]). That sum represented approximately 36% of the global resources and converted to a sterling sum of c. £330 million. The departure from equality in the husband's favour was justified by the compounding factors of the post-separation accrual of assets and his special or 'stellar' contribution.

*Needs*

33.   *"Needs"* is a flexible concept. As Lord Nicholls said in *White* at [993]:

> *"In assessing financial needs, a court will have regard to a person's age, health and accustomed standard of living. The court may also have regard to the available pool of resources".*

34.   In appropriate cases, *"needs"* should be 'generously interpreted' (*per* Baroness Hale in *Miller; McFarlane* at [144]).

*Inferences*

35.   The Court may draw appropriate inferences from silence. As Lord Sumption observed in *Prest v. Petrodel Resources Ltd* [2013] 2 FLR 732 at [45]:

> *"...[J]udges exercising family jurisdiction are entitled to draw on their experience and to take notice of the inherent probabilities when deciding what an uncommunicative husband is likely to be concealing."*

## ANALYSIS

### DEPARTURE POINTS:

### (1)   WAS THERE PRE-MARITAL WEALTH?

36.   H asserts he was wealthy before his marriage to W in 1993. H's bare assertion has, however, not been supported either by any schedule of the value of his pre-marital assets or any documentary or independent evidence. The only figure H has provided is that in 1993 he paid £700,000 for the first matrimonial home in Hampstead. However, even if this is correct (and assuming no mortgage), the matrimonial home occupies a unique position and would be subsumed into this long marriage (*c.f.* Lord Nicholls in *Miller v. Miller* at [24]).

37. It is axiomatic that if a party is going to assert pre-marital assets, it is incumbent on them to prove the same by clear documentary evidence (*per* Mostyn J in *N v F* [2011] 2 FLR 533 at [24]). H has failed to do this and, accordingly, failed to prove any case on pre-marital assets.

(2)  WHEN DID THE PARTIES SEPARATE?

38. W contends the marriage lasted 20 years and only broke down in October 2013 (when she issued her divorce petition), and it was only after a failed attempted reconciliation in summer 2014 that the marriage finally ended in late 2014.

39. H, on the other hand, contends that the marriage ended in 1999, or at latest, in 2004. H says in his Form E that any sharing claim by W *"should be based on wealth generated at the latest up to 2004 but not thereafter"*. The significance of this issue is that it goes to whether the vast sum realised from the sale of H's Northgas shares in November 2012 (US$1.375 million) is to be included in the marital assets.

*1999/2003 hiatus*

40. The marriage clearly went through a rocky patch between 1999 and 2003. H states that the marriage broke down in 1999 when he discovered that W was having an affair with a younger man. H was angry and matters were clearly not right between them. W issued a divorce petition in London in 2003. H applied to strike out W's petition on the grounds that the marriage had already been dissolved by a Russian decree granted in the Moscow court on 18th August 2000. H produced 'official' Russian court documents to this effect. However, a search by W's lawyers of the official records in the Moscow court revealed that no such divorce proceedings existed. (This was recently confirmed for these proceedings in a Civil Evidence Act notice statement of a Moscow lawyer, Ms Alpatikova Ivanovna, served by W in support of her financial claim. This statement was not challenged by H's leading counsel at the PTR on 25th October 2016. The inference to be drawn, therefore, is that the 2000 Moscow divorce documents relied upon by H were, at all material times, forged.)

41. Shortly after this unedifying episode, however, there was a reconciliation between H and W. On 4th July 2006, H's solicitor Mr Kerman, signed a consent application to dismiss W's petition which recorded *"the parties having been reconciled"*. On 8th June 2008, Munby J dismissed W's petition by consent. District Judge MacGregor observed when dealing with the recent costs application from the stay proceedings, that H has been unable to give any real explanation for this representation to the court by his solicitor. I agree.

42. W admitted the affair but explained in her statement that the extra-marital physical relationship was not at the expense of her emotional commitment to H and their marriage. She said that marriages can survive affairs, and this marriage was one of them. She said H himself had had numerous affairs himself during the marriage (and had a child by another woman in 2013). H does not disavow that he and W had a sexual relationship between 1999 and 2004, but simply denies that they did so thereafter. (He merely stated *"After 2004 we never had any intimate relations..."*).

*2004 to 2013*

43.   H's essential argument appears to be that between 1999 (or 2004) and 2013 the parties only came together for the sake of their children. However, H has produced no valid documentary evidence to support his case on *de facto* separation, nor any witnesses, nor has he chosen to appear before the court to be cross-examined on this point.

44.   W gave evidence before me and explained the background and history of the marriage. She was a reliable and straightforward witness. I accept her evidence that, following the earlier hiatus, H and W remained married until 2013 in all senses of the word. H travelled a great deal to Russia and elsewhere on business and was non-resident in the UK for tax purposes (the Inland Revenue allowance has latterly been 90 days). However, the family base was always *Somerton House* and they regularly enjoyed family holidays at *Villa le Cottage*. They slept in the same bed when they were together, had sex, went on holiday regularly together with the boys, and shared a joint bank account. H continued to support W financially in exactly the same way as before, and to the same degree. They exchanged presents. H continued to be very generous with gifts. In 2013, for example, H purchased jewellery for her worth €400,000. H paid all the household bills and running costs of *Somerton House* and *Villa le Cottage* and paid for all their luxurious holidays. H provided W with the unrestricted use of two of his credit cards, and latterly the use of his yacht, plane and helicopter.

45.   W has exhibited to her statements and gave evidence regarding numerous photographs taken since 2004 which show: (i) W and H together with their sons; (ii) W and H together in various social settings enjoying a normal social life (with figures such as Mr Boris Berezovsky); (iii) W and H together in affectionate poses, often on holiday together in the South of France; (iv) W and H together at H's lavish 50th birthday party in September 2005 with W giving a speech for him; (v) evidence that H continued to live at *Somerton House* where he kept an extensive wardrobe of clothes in his wardrobes in their bedroom, and various cars; (vi) H in shooting kit; and (vii) H and W in an intimate embrace in the Maldives in 2013. This latter photograph, in particular, sells the lie to H's assertion that the parties only came together for the sake of the children.

46.   In addition, W produced documentary evidence, including e-mails with architects and contractors, showing that she was actively involved in the renovation of *Villa le Cottage*, and planning their 'dream home' in Baku in Azerbaijan. An elaborate design plan was drawn up for the Baku house in August 2011 entitled *"Mr and Mrs Akhmedov Baku Residence - Presentation"*. H accepts that W was involved in the interior design of these properties. It is surprising that H would have wanted W to have been actively involved in this significant building project in his homeland if, as he contends, the marriage had ended some 7 to 12 years earlier. W was also primarily involved in choosing their art collection which includes some Mark Rothko and Yves Klein paintings worth many tens of millions of pounds ("the Modern Art Collection").

47.   In his dealings with third parties, H referred to W as *"my wife"* in *e.g.* H's emails in 2011 and 2012 to the organisers of an art fair, his solicitors, Amex, Sotheby's and

17

Knight Frank. H accepts that he discussed the sale of Northgas with W in 2012. Further, on his application form to Surrey Police to renew his shotgun licence in December 2012, H put *Somerton House* as his home address for the previous 5 years (*i.e.* 2007 – 2012). This assertion was certified by his English solicitor of long-standing, Mr A.D. Kerman, as being true. Mr A.D. Kerman has, until recently, been advising H in these proceedings.

48.   The fact that the parties did not spend every night under the same roof does not mean that there was not a subsisting marriage. Many married couples spend time apart. Being physically apart for much of the year does not mean that a marriage does not exist. The courts does not undertake a *priori* assessment of the quality of the marriage in considering financial provision. The reason for this is obvious: there is no yardstick that can be used; there is no legal definition of what constitutes a 'normal' marriage; marriages come in all shapes and sizes; and, the law rightly does not encourage *"a general rummage through the attic"* of a marriage (per Coleridge J in <u>*G v. G (Financial Provision: equal division)*</u> (*supra*)).

*The broad picture*

49.   The broad picture is that, during the marriage, W and the children lived in Surrey and H, as an international businessman, travelled frequently for his work, principally to Russia. However, the family base was always *Somerton House* and H would return there to be with his family within the time permitted by the Revenue for non-resident taxpayers. Family holidays were always spent abroad: in the Maldives, in ski resorts, but principally in *"Villa le Cottage"*, the family holiday home in Cap Ferrat.

50.   For these reasons, on the evidence before me, I am satisfied and find as a fact that, notwithstanding the temporary hiatus described above, H and W's marriage lasted over 20 years from 1993 to October 2013 when W issued her petition; and the marriage only finally came to an end, after a failed attempt at reconciliation, in late 2014.

(3)   DID H MAKE A SPECIAL OR 'STELLAR' CONTRIBUTION?

51.   H asserted in his statement of issues that he made a special or stellar contribution to the wealth creation which would justify a departure from a 50:50 division of the assets in his favour. However, save for explaining the difficulties of doing business in Russia and the legal problems he encountered with Gazprom in holding onto his Northgas shares, H did not to explain in his statements precisely why he could be said to have made a 'stellar' contribution. It is not clear, therefore, whether this line of argument would have been pursued by H at the trial. However, *ex abundantae cautelae*, I summarise the basic facts of his business dealings as set out in his witness statement.

52.   In 1993, H acquired a 5% shareholding in a Russian company called ZAO Northgas ("Northgas") which had been granted an exploration licence from Gazprom (the Russian state-owned oil and gas monopoly) to search for natural gas in Urengoi, Western Siberia. The other shareholders were Urengoigazprom (a Gazprom subsidiary) and Bechtel (an America company). Geological reports were prepared but, before

production infrastructure could be built, in 1998 the Russian economy collapsed. Gazprom had no money and Bechtel withdrew. H, however, continued with the project, took up a rights issue and worked hard to make Northgas a success. Production began in 2001 and Northgas developed into a valuable producer of natural gas. H encountered litigation problems with Gazprom. In June 2005, H transferred 51% of the shares in Northgas to Gazprom. However, disputes with Gazprom continued. In late 2012, Gazprom permitted H to sell his shares in Northgas to a company called Novatek. The price realised was US$1.375 billion.

53. In my judgment, whilst H clearly worked very hard to create wealth out of Northgas and was resourceful, H's evidence falls far short of the exceptionality (or 'genius') test elucidated in authorities such as *Sorrell*, *Cooper Hohn* and *Gray v Work* (see above).

54. The following further points are pertinent. First, H's contribution was not 'unmatched' (to use Holman J's words in *Gray v. Work*); at the same time as H was away travelling and building up Northgas in Russia, W was 'keeping the home fires burning' at St. George's Hill, running the home and caring for the boys, as well as H's daughter in earlier years, on her own in what was then a foreign country to her. Second, this was a case of the realisation of Northgas's value built up during the previous 20 years when the marriage subsisted, not merely of fresh accrual. H at one stage sought to argue that Northgas's share were 'worthless' in 2004 because he could not sell them. This was clearly not the case because he sold 51% to Gazprom in 2005. In any event, the point is academic because it is a fact that H sold his remaining shares in Northgas to Novatek in 2012 for US$1.375 when the marriage was subsisting. Third, W is now only seeking 41% of the assets instead of a 50:50 split, which gives some margin of appreciation (see further below).

55. For these reasons, I reject any case made by H that he made a special or 'stellar' contribution to the marital assets such as to justify a departure from the equality principle.

56. In my judgment, the present case is a paradigm example of what Lord Nicholls was talking about in *White* when he said at [989]:

> "If, in their different spheres, each contributed equally to the family, then in principle it matters not which of them earned the money and built up the assets"

Summary of findings on 'departure points'

57. For the above reasons, I find that H has failed to prove any valid reasons or 'departure points' which would justify the matrimonial property being divided other than equally 50:50. In particular, I find the following. First, that the marriage endured from 1993 until 2013 as W contends (and was not 'over' in 1999 or in 2004 as H's contends). Second, that there is no need to consider H's case on post-separation accrual because the wealth was generated during, and not after, the subsisting marriage. Third, that all the (considerable) wealth that was generated during the marriage is matrimonial property.

## COMPUTATION OF THE MARITAL ASSETS:

### (4)   WHAT IS THE VALUE OF THE AVAILABLE ASSETS?

58.   For convenience, before dealing with the trust issues, I shall deal with the question of the value of the assets (assuming for the moment that they form part of the marital assets available for distribution).

59.   Valuation of the assets is a relatively is straightforward task in this case. This is because W's evidence is relatively clear and there is a lack of any countervailing evidence from H to gainsay the values that W puts forward.

60.   The total value of the assets put forward in the Schedule of Assets is £1,092,334,626. The valuation figures for the particular items in the Schedule are taken variously from property valuations (in cases where they have been obtained), agreed property values, bank balances and portfolio values. The figures relating to H and Cotor are not entirely up-to-date because no up-to-date figures or valuations have been provided by H, in breach of the disclosure order made by Moor J at the PTR on 25th October 2016. H cannot be heard to complain about W not using the most up-to-date figures, in view of his failure to comply with Moor J's order.

61.   There are no problems of liquidity: the assets are cash, or can easily be converted into cash.

62.   I am satisfied, and find, that the value of each of the available assets is as listed in the Schedule of Assets, i.e. totalling £1,092,334,626 (subject to the trust issues below).

### (5)   WHAT ARE THE TRUST ISSUES?

*H's case*

63.   H's case is that his wealth from the sale of his Northgas shares is held in the Akhmedov 2013 Discretionary Trust, which is a Bermudian trust ("the Trust"). H's case is that within the Trust structure are Panamanian, Cypriot and Isle of Man companies which each hold assets in the form of: (i) a majority share in a Moscow property, (ii) the yacht *M/Y Luna*, (iii) a plane, (iv) a helicopter, (v) a modern art collection and (vi) large cash funds and investments administered by UBS in Zurich. An organogram showing the structure of the Trust, as H asserts it to be, is also annexed to this judgment.

*H's case*

64.   W's answer is four-fold:

(1)   First, Cotor is H's nominee and holds all its assets for H absolutely;

20

(2) Second, Cotor's shares are not 'in' the Trust; there is no evidence that its bearer shares are held by the trust. But at the time that the trust was settled, Cotor had been in existence for 2 years and was not mentioned in the trust. And then in March 2015, when the other companies were included in the Trust, Cotor was not included. H was asked to show all deeds relating to Cotor but none produced showing transfer from Cotor to Woodblade. W's solicitors PHB wrote to Sears Tooth dated 14th November 2016 and asked for independent documentary evidence which confirms that Cotor is within the trust structure and said that absent such evidence *"we will be asking the Court to draw the inference that the Cotor is your client's nominee"*.

(3) Third, the disposition of the companies which own the yacht, plane, helicopter and real property in March 2015 to the trustee should all be set aside or reversed under s.37 of the Matrimonial Causes Act 1973 and/or s.423-5 of the Insolvency Act 1986;

(4) Fourth, in any event, whatever their corporate organisation, the so called Trust assets are all resources available to H whenever he pleases.

65. It is convenient to deal with the fourth Trust Issue (4) first.

### Trust Issue (4) - Trust assets are H's "resources"

66. I turn to W's fourth trust point, namely that whatever the corporate organisation of the so-called 'Trust' assets they are *"resources"* which may be aggregated as part of the court's computation exercise.

67. H purchased the yacht, plane and helicopter in 2014 in his name. H purchased the 115m superyacht *M/Y Luna* (formerly owned by Mr Abramovich) on 20th February 2014 for €260m (it underwent a €42m refit in 2016). He purchased a *Bombardier Global 6000* private jet on 31st March 2014 for $52.6m. H purchased an *Airbus EC 155* helicopter on 31st October 2015 for €10m. H then assigned his interest in these assets to three separate offshore companies. H assigned *M/Y Luna* to Tiffany Limited which then sold it to Avenger Assets Corporation (a Panamanian company). H assigned the *Bombardier* aircraft to Carolina Ltd (a Manx company). H assigned the *Airbus EC* helicopter to Lucy Ltd (a Manx company).

68. It is clear that the funds for these purchases had been transferred to H's UBS private client account (CH35 0024 0240 6057 8070 R) by Cotor. H's bank statements record, for instance, a payment on 15th December 2014 of €260m to Avenger Assets Corporation, *i.e.* the purchase price of *M/Y Luna*.

*Disposition to the Trust on 17th March 2015*

69. By a Deed of Trust dated 17th March 2015 (*i.e.* four days before he signed his witness statement dated 21st March 2015), H purported to assign the entire issued share capital in these three offshore holding companies (Avenger Assets Corporation of Panama, Carolina Ltd and Lucy Ltd) together with a Moscow property to the Trust. It is to be

21

inferred that H did so because he owned these companies. I return to questions raised by this disposition (which W seeks to reverse) further below.

*Woodblade Trust Deed 2013*

70.   Woodblade is a trustee company registered in Cyprus.  The Woodblade Trust Deed dated 2nd October 2013 is a remarkable document.  H is the Settlor, Principal Beneficiary and Protector.  H is also the only director of Woodblade.  H alone has the power to 'hire and fire' the Protector and the Trustees.  Woodblade does not provide trustee services to any other trust.  All the checks and balances that one would normally expect in a trust of this sort have been removed, so far as all discretionary beneficiaries are concerned.  Clause 1 appoints H as *"the Settlor"* as the Principal Beneficiary.  Clause 2 gives the Trustees absolute discretion to pay out to the Principal Beneficiary *"...to the exclusion of... the Discretionary Beneficiaries"*.  Clause 12 excludes the 'self-dealing' rule.  Clause 14 gives blanket protection to the Trustees.  Clause 15 appoints H *"the Protector"*, who is, in effect, omnipotent.  Clause 16 of the trust deed states that the trustee's discretion *"...shall only be exercisable by them with the prior or simultaneous written consent of the Protector"*.

71.   The Trust operates without any formalities.  H has stated in his answers to Questionnaire that *"the Trust does not produce accounts"* and when asked for a copy of a 'letter of wishes' and correspondence between himself (in his roles as Settlor, Protector and Principal Beneficiary) and the Trustees, the Respondent replied *"none"*.

72.   Thus, the way in which the Trust is intended to operate is remarkable in its simplicity: *i.e.* by H, *qua* Principal Beneficiary, asking himself, *qua* sole director of Woodblade, for a distribution and then H, *qua* Protector, asking himself whether or not such a distribution should be met.  The Trustees can ignore the needs of the other beneficiaries and benefit H by transferring the whole or any part of the capital to him.  The Trustees (in essence H) owe no duty of care and are free from the self-dealing rule: he can pay money to himself whenever he wishes.  The Trust document is not a sham in the sense of pretending to be something that it is not.  It is a remarkably candid and pellucid document which makes no pretence to be anything other than what it is, namely what is colloquially called a 'Dear me' trust for H for his lifetime.

73.   H has made no secret of the fact that he has free and unrestricted access to the Trust funds.  In his Form E H stated that *"...all of my income needs are met from payments from the trust"*.  He put his current income needs at $25m *per annum*, and future needs at £16.18m.  He also stated that *"... any [capital needs] are met from the trust"*.  H has disclosed a schedule showing distributions to him in excess of US$110m between 30th June 2014 and 17th February 2016 (see below).  It is to be inferred that, if H did not have the funds in his personal bank accounts, any lump sum award in favour of W in these proceedings, would and could be paid from the Trust, just in the same way as Cotor advanced the large sums to H in 2014 to buy the yacht, plane and helicopter.

74.   The legal question as regards the Trust is as follows: If a discretionary beneficiary were to request the Trustee of the Woodblade Trust to advance the whole or part of the capital to him, would the Trustee be likely to do so now or in the foreseeable future? (*c.f. Charman v Charman* (supra).  I am satisfied that the answer on the evidence in this case is 'yes' and any funds held in the Trust can be considered to be *"financial*

resources" to H. Accordingly, I find that the so-called Trust assets are *"financial resources"* under s.25(2)(a) of the Act available to H from which H can pay W's financial award in these proceedings.

## Trust Issues (1) and (2) - Cotor

75. I turn to W's points (1) and (2) regarding Cotor. Cotor is a Panamanian company formed in September 2011. A recent company search shows its share capital to be 100 bearer shares and that H is Cotor's 'President Ad Hoc' at shareholders' meetings.

76. W contends that Cotor is H's nominee or *alter ego* and that any assets held by Cotor are held for H. In this regard, and to aid enforcement, W is also seeking:

    (1)    a declaration that Cotor is H's nominee, and the assets (the UBS portfolio and the Modern Art Collection) held in the name of Cotor belong to H;

    (2)    an order that Cotor and H are jointly and severally liable to pay the lump sum of £350m; and

    (3)    an order that Cotor transfers the Modern Art Collection in its name to W, and the court declares that W is the legal and beneficial owner of the Modern Art Collection.

### Analysis

77. The following points are pertinent. First, H admits personally receiving $1.375 billion in November 2012 for his Northgas shares. These monies were somehow transferred into the name of Cotor. There is no evidence, however, that H received any consideration for transferring those monies to Cotor. Moreover, Cotor has not produced any accounts or documents to explain the basis on which it came to hold these valuable assets. It is trite law that where money is given gratuitously by A to B, absent presumption of advancement (e.g. parent to child), the inference is of resulting trust, *i.e.* that the legal owner of the asset holds it absolutely for the transferor. There is, therefore, a presumption of resulting trust which it falls upon to H to rebut. H's failure to plead a defence to this case, or to present himself to give evidence, means that the presumption remains unrebutted. The words of Lord Sumption in *Prest* at [49] are apposite in the present case:

> *"Since no explanation has been forthcoming for the gratuitous transfer of these properties to [Cotor], there is nothing to rebut the ordinary presumption of equity that [Cotor] was not intended to acquire a beneficial interest in them."*

78. Second, the manner in which Cotor has funded H's numerous purchases and lifestyle is redolent of Cotor merely been an open cheque book for H. By H's own admission, Cotor (i) paid for the outgoings on *Somerton House* and *Villa le Cottage*, (ii) purchased the yacht, plane and helicopter, and (iii) transferred tens of millions of dollars direct to H (during the period 30th June 2014 to 24th March 2016, H received distributions from Cotor of US$97 million, £6.8 million, €6.4 and CHF 27k).

79. Third, H has stated that assets in Cotor's name are within the Trust structure. However, there is no independent, documentary or contemporaneous evidence to support his assertion. Cotor was registered on 16th September 2011. The Trust was formed on 2nd October 2013. Cotor had, therefore, already existed for two years before the Trust was set up, but there is no evidence that Cotor and/or its assets were subsequently settled in the Trust . Further, there is no evidence to show that any payments by Cotor to H or on his behalf were approved by Woodblade or the Trustee. No trustee or directors' resolutions of any description have been disclosed.

80. Fourth, as presaged above, on 17th March 2015, H assigned the entire issued share capital in Avenger Assets Corp, Carolina Ltd and Lucy Ltd to the Trust. However, Cotor was not included in this assignment.

81. Fifth, H's treatment of Cotor mirrors his treatment of Cotor Investment Ltd, a BVI company which existed before the sale of the Northgas shares and the formation of the Woodblade Trust in 2013. In his answers to the Questionnaire, when describing his wealth in 2004, H said he had cash and securities at UBS of $78m. However, the UBS account which H was referring to as "his" account was, in fact, an account in the name of Cotor Investment Ltd. There is no evidence that Cotor Investment Ltd ever traded or generated any wealth of its own.    It is to be inferred that that, H considered Cotor Investment Ltd to be a mere personal depository for his cash and securities. The same inference can be drawn in respect of Cotor, which H used as his 'piggy-bank'.

82. Sixth, it is perhaps telling that in a signed written statement dated 21st March 2015, H spoke of the Trust as being "beneficially interested in" art, cash and securities, i.e. thereby suggesting that Cotor was a mere nominee (albeit for the Trust, not H).

83. Seventh, on 14th November 2016, W's solicitors, PHB wrote to H's then solicitors, Sears Tooth, asking them to provide independent documentary evidence which confirms that Cotor is within the Trust structure, and to explain, with documentary evidence, who has held the legal and beneficial interest in Cotor's shares from 1st January 2013 to date. The letter concluded: "If your client does not provide this documentation we will be asking the court to draw the inference that Cotor is your client's nominee". No reply has been received.    In view of this silence, a reasonable adverse inference can be drawn against this "uncommunicative husband" (per Lord Sumption in Prest, supra, at [45]).

84. For the above reasons, I find that Cotor is H's nominee and that Cotor holds all its assets absolutely for H on a 'bare' trust.

*Bare trust*

85. The *Law Commission Report on Trusts of Land (No. 181) (1989)* defined a bare trust as follows (in paragraph 3.27):

> "A bare trust exists where the entire beneficial interest is vested in one person and the legal estate in another. The trustee in such a case has no duties other than to obey the beneficial owner, who is, to all intent, the real owner."

24

(see also *Lewin on Trusts*, Chapter 1-028)

86.  The terms 'bare trustee' and 'nominee' are often used interchangeably. In essence, a bare trustee and a nominee are 'nominal' title holders, holding an asset for another person who is the true beneficial owner for all purposes. A bare trustee is a trustee who is a mere repository of the trust property with no active duties to perform, and with no responsibilities in relation to trust property other than to preserve the property for the beneficiary (and the transferor of the assets). The bare trustee's duties are purely passive, and 'bare' or naked of active duties decreed by the settlor. In *IRC v Silverts Ltd* [1951] Ch D 521 at p 530 the Court of Appeal described a bare trustee of shares in a company as being *"a mere name or 'dummy' for the true owner"*.

*Prest v Petrodel Resources [2013]*

87.  In my view, the present case is on all fours with *Prest v Petrodel Resources* [2013] UKSC 34 and [2012] EWCA Civ 1395. In the Court of Appeal in *Prest*, Rimer LJ (with whom Patten LJ agreed) stated:

> *"[136] ... If property held by a husband has been put into the name of someone who, on the evidence, is obviously a bare trustee for him, there will be no problem in holding that the beneficial ownership has not changed. As explained in the first sentence of the last quoted paragraph, the court will also not be bamboozled by the use by husbands to a like end of "shams, artificial devices and similar contrivances".*

88.  The Supreme Court in *Prest* confirmed the tenacity of the rule in *Salomon's* case in family cases, i.e. that a company is a legal entity distinct from its shareholders, and its assets are its own, and not those of its shareholders, even where company is owned and controlled by one person. The Supreme Court re-iterated that the circumstances in which the corporate veil could be lifted were very limited, and no special exception should be made for financial remedy proceedings, even in circumstances where the husband had misapplied the assets of his company for his own benefit. However, their Lordships held that the restriction on 'piercing the corporate veil' does not apply to circumstances in which the company is a 'bare trustee' holding assets in its name for the husband.  The Supreme Court took the classic 'resulting trust' route and ordered the companies to transfer properties registered in their names directly to the wife.

*Summary*

89.  As stated above, Cotor has not appeared in this case, nor filed any evidence from a director or officer, not disputed W's assertion in her Case that Cotor is H's nominee. Nor has H himself challenged that assertion.

90.  Against this background, in my judgment, in the light of H and Cotor's non-disclosure and non-cooperation in these proceedings, the Court is entitled to draw similar inferences as the Supreme Court did in *Prest*. As Lord Sumption articulated:

> *"[47] The judge's finding about the ownership and control of the companies mean that the companies' refusal to co-operate with these proceedings is a course ultimately adopted on the direction of the husband. It is a fair*

> *inference from all these facts, taken cumulatively, that the main, if not the
> only, reason for the companies' failure to co-operate is to protect the London
> properties. That in turn suggests that proper disclosure of the facts would
> reveal them to have been held beneficially by the husband, as the wife has
> alleged".*

91.    The form of order sought by W in this case, whereby Cotor (*qua* nominee/bare trustee
       for H), shall pay the lump sum to W and transfer the Art Collection is in line with order
       made in *Prest* where the companies were found to hold the properties on trust for the
       uncommunicative husband, and they (*qua* nominee/ bare trustee) were ordered to
       transfer the properties to the wife. I shall so order.

### Trust issue (3) – W's application to set aside the March 2015 disposition

92.    W seeks an order setting aside the Deed of Trust dated 17th March 2015.

93.    The timing is telling. The Deed of Trust dated 17th March 2015 was executed four
       days before H signed his first witness statement in the present proceedings. By the
       Deed of Trust, H purported to assign to the Trust the entire 100% issued share capital in
       the three offshore holding companies (*i.e.* Avenger Assets Corporation of Panama,
       Carolina Ltd and Lucy Ltd) relating to the yacht, plane and helicopter. In addition, H
       also assigned to Woodblade his 60% shareholding in a Cypriot company, Sunningdale
       Limited, which held in a  Moscow property, 9 Solyanka Street, Moscow. (I shall refer
       collectively to these as "the March 2015 Companies").

94.    On the same day, 17th March 2015, H executed a document described as *"Declaration
       of Trust"* by which he purportedly assigned to Woodblade Ltd as Trustee of the Trust
       his right, title and interest of whatsoever nature in all the March 2015 Companies. H
       also declared himself to be Trustee of the March 2015 Companies in favour of the Trust
       Woodblade Ltd and undertook to deal with the March 2015 Companies only as directed
       by Woodblade Ltd (a company of which, of course, he was sole director). In my view,
       it is clear that H was attempting to hide the March 2015 Companies in an offshore trust
       because he was faced with W's imminent claims in these proceedings. (I shall refer to
       this as "the March 2015 Disposition").

95.    On 21st March 2015, only four days after effecting the March 2015 Disposition, H
       signed a witness statement in support of his application for a stay of these (English)
       proceedings in favour of Russia on the grounds of *forum non conveniens*. In his witness
       statement, H asserted that he was merely *"... one of a number of discretionary
       beneficiaries of an offshore trust which is beneficially interested in the ... assets [of the
       March 2015 Companies]...".* It is clear that this was a transparent attempt to put the
       assets of the March 2015 Companies out of his (legal) reach and to inhibit W's ability
       to claim or include those assets as part of the marital asset reckoning or, at least, to
       make enforcement of W's claims more difficult.

*Section 37 MCA 1973*

96.    The March 2015 Disposition falls to be considered under s.37 MCA 1973. Section 37
       gives rise to a legal presumption in relation to such dispositions made within the past

three years.  In *AC v DC (No 1)* [2013] 2 FLR 1483, Mostyn J usefully summarised the operation of s.37:

> "*[9] For W's application to succeed the following has to be demonstrated:*
> *(i) That the execution of the [disposition] was done by H with the intention of defeating her claim for financial relief. This is presumed against H, and he has to show that he did not bear that intention... The motive does not have to be the dominant motive in the transaction; if it is a subsidiary (but material) motive then that will suffice... .*
> *(ii) That the execution of the [disposition] had the consequence of defeating her claim. This means preventing relief being granted, or reducing the amount of any such relief, or frustrating or impeding the enforcement of any order awarding such relief...*
> *(iii) That the court should exercise its discretion to set aside the [disposition].*
> *(iv) However, ... there is an exception to the general rule that all dispositions are liable to be set aside. The disposition in favour of [the recipient] will not be set aside if it can be shown at the time it was made that,*
> *a) it was done for valuable consideration; and*
> *b) [the recipient] acted in relation to it in good faith; and*
> *c) [the recipient] was without notice of any intention on the part of H to defeat W's claim for financial relief.*
> *[10] The knowledge of [the recipient] referred to in para [9](iv)(c) above is not confined to actual knowledge but extends to constructive knowledge...*
> *[11] Although there is a formal legal burden on W to demonstrate the negative of the matters referred to in para [9](iv) above, I take the view that for obvious reasons (having to prove a negative; lack of knowledge) there is an evidential burden shifted to LF to establish this exception. If he does not establish all three limbs of the exception then the defence will not arise."*

97.   Section 37 can operate to impugn transfers to offshore trusts (as it was in *AC v DC (No 1)*, a case which involved the transfer of assets to a Manx EBT). The effect of a s.37 order is that the court declares the disposition "*void ab initio*" (see *AC v DC (No 1)* at [22]).

*Application of s.37*

98.   By reason of s.37, it is to be presumed against H that the intention of the March 2015 Disposition was to defeat or impede W's claim.  It is for H to show that the March 2015 Disposition did not bear that intention.

99.   H has, however, produced no such evidence to this effect. The assertion in his witness statement that he is only "*one of a number of discretionary beneficiaries*" is no more than that, *i.e.* an assertion. The presumption is, therefore, again unrebutted.

27

100. The March 2015 disposition would appear to be part of a wider pattern of conduct by H designed to put his assets out of the reach of W, *viz.* in particular the very substantial cash distributions from Cotor between June 2014 and March 2016 (see above).

101. In my view, this is a paradigm case for the application of section 37 MCA 1973. I shall order the setting aside of the March 2015 Disposition and make the appropriate declaration.

*Section 423 Insolvency Act 1986*

102. Section 37 has a sister provision under the general law, namely s.423 Insolvency Act 1986 ("IA 1986") (which also has extra-territorial effect). Since the March 2015 Disposition falls squarely within the purview of s. 37 MCA 1973, there is strictly speaking no need to rely on s. 423 IA 1986. However, it may aid enforcement if an order is also made under s. 423 Insolvency Act 1986, a provision not limited to matrimonial claims.

103. Section 423 of the Insolvency Act 1986 provides:

> "423 Transactions defrauding creditors.
> (1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—
> (a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;
> (b) he enters into a transaction with the other in consideration of marriage [F1 or the formation of a civil partnership]; or
> (c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.
> (2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—
> (a) restoring the position to what it would have been if the transaction had not been entered into, and
> (b) protecting the interests of persons who are victims of the transaction.
> (3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—
> (a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or
> (b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.
> (4) In this section "the court" means the High Court or—
> (a) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;
> (b) if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

"(5) *In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".*"

*Application of s.423 IA 1986*

104. Section 423 IA 1986 enables a "*victim*" to apply for an order to restore the position to what it would have been if the offending transaction had not been entered into (s. 423(2)). A "*victim*" which means anyone prejudiced by the impugned transaction (s. 423(5)). The test is that the transaction must have been at an "*undervalue*" (s. 423(1)).

105. The March 2015 Disposition plainly was at an undervalue. H clearly entered into the transaction for the purpose of either: (a) putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, and/or (b) otherwise prejudicing the interests of such a person in relation to the claim which is making or may make. Thus, for the same reasons given above in relation to s.37 MCA 1973, it is to be inferred that H intended by the March 2015 Disposition, at the very least, to "*prejudice [W's]… interests in relation to the claim*".

106. W formally asserted a s.423 claim against H in her Case in respect of the March 2015 Disposition. H's failure to answer that claim also enables an adverse inference to be drawn against him in relation to his intention behind the disposition. ·

107. The Court may make any it order it sees fit for restoring the *status quo ante* (including but not limited to those set out in s. 425 IA 1986). W seeks an order reversing the March 2015 Disposition and vesting the shares in the March 2015 Companies in H. I shall so order.

## DISTRIBUTION:

## (6) WHAT IS A FAIR DISTRIBUTION OF THE MARITAL ASSETS?

108. I turn, finally, to the question of fair distribution of the marital assets. The total wealth in this case is £1,092,334,626 (see the attached Schedule of Assets).

109. I find that this entire wealth is matrimonial in character, *i.e.* it was acquired and built up during the long marriage by H and W's equal contributions to the welfare of the family, and should be subject to the sharing principle (see above). There are no 'Departure Points' in this case (see above).

110. Accordingly, I can see no reason in principle why there should not be an equal 50:50 division of the total marital assets in this case, *i.e.* £1,092,334,626.

*W's claim*

111. W originally made an open offer under FPR 2010 of a payment of a lump sum of £350 million in a letter dated 7th April 2016 (repeated in a letter dated 14th November 2016).

This represented some 33% of the marital assets. In breach of the rules, H did not himself make an open offer. W's offer was made, no doubt, in the hope of avoiding a painful trial (in which, moreover, H was seeking to serve a statement from one of the children). W is not bound by her open offer. An unaccepted offer can be revoked.

112. In addition to a lump sum payment of £350 million (and the assets she currently holds of £10,165,162), W is now also seeking a further £93,060,990 comprising the following:

(1) The chattels situated at *Somerton House* valued at £2,479,125;

(2) The *Aston Martin Virage Vantage Coupé* motor car (registration mark W7 FTA) in Surrey valued at £350,000 (the sale proceeds of which is intended to provide a fighting fund to assist in the enforcement of the Order abroad).

(3) The modern art collection held by Cotor which has recently been valued (on a sale basis) at $112m (£89,989).

113. The total value of W's claim is now, therefore, £453,576,152. This comprises some 41.5% of the total marital assets. I find that this figure is justified in all the circumstances. I shall so order.

## ANCILLARY MATTERS:

### (7) SERVICE

114. It is necessary to consider the question of whether or not proceedings have been properly served on the Respondents.

*Service of proceedings on H*

115. I am satisfied that H has been properly served with the up-to-date proceedings in this matter, in particular, (i) Moor J's Order dated 25th October 2016 which ordered Woodblade and Cotor be joined as parties, (ii) W's Case re the Trust, and (iii) the trial bundles and authorities.

116. H was represented at the PTR before Moor J on 25th October 2016 J by Sears Tooth and Leading Counsel. H, therefore, had notice of all the terms of the Order that Moor J made on that date. The sealed PTR Order and W's Case re the Trust was served on Sears Tooth before they applied to come off the record on 9th November 2016. Sears Tooth did not received the sealed order removing them from the record until 16th November 2016. I am satisfied that H knew, or must be taken to have know, that Woodblade and Cotor had been joined as parties in these proceedings and that W was seeking declarations and orders in respect of Cotor.

117. PHB attempted to contact H directly after Sears Tooth came off the record, using an email address which the Court has previously approved for service, and one that W uses to communicate with H. The documents and authorities were sent to H on Friday 25th November 2016 before the hearing commenced on 28th November 2016 with 2 judicial

reading days. H failed to respond to any letters which were sent to him or make any acknowledgement of receipt of any communications or documents.

*Service of proceedings on Woodblade and Cotor (and constructive notice)*

118.   I am satisfied that Woodblade and Cotor have themselves been properly served with the up-to-date proceedings in this matter, in particular, (i) Moor J's Order dated 25th October 2016 which ordered Woodblade and Cotor be joined as parties, (ii) W's Case re the Trust, and (iii) the trial bundles and authorities.

119.   FPR 2010, r.6.14, provides that any document may be served out of the jurisdiction without the permission of the court (*c.f.* the CPR 1998).

120.   I am also satisfied that, Woodblade and Cotor can be taken to have had actual or constructive notice of all orders, documents and proceedings that H has been served with, and notice of joinder and the relief that sought against them by W. This follows from H's role and relationship with Woodblade and Cotor and the fact that these companies are both controlled by H, and are his *alter egos* (see above).

*Woodblade*

121.   I have read and accept the statement of Mr Ian Connell, a partner of PHB, regarding service. Mr Connell explains the steps that have been taken by PHB to serve Woodblade in Cyprus by fax, email and by post variously with the PTR Order, W's Case of the Trust and W's counsels' trial opening and authorities on 26th October, 31st October, 8th November and 25th November 2016 at its registered address in Cyprus (the address of its attorneys). No response was received from Woodblade.

*Cotor*

122.   FPR 2010 r. 6.43 contains general provisions regarding service out of the jurisdiction:

> "*(3) Where the applicant wishes to serve an application form, or other document, on a respondent out of the United Kingdom, it may be served by any method –*
>     *(a) provided for by –*
> *(i) rule 6.44 (service in accordance with the Service Regulation);*
> *(ii) rule 6.45 (service through foreign governments, judicial authorities and British Consular authorities); or*
>     *(b) permitted by the law of the country in which it is to be served.*
> *(4) Nothing in paragraph (3) or in any court order authorises or requires any person to do anything which is contrary to the law of the country where the application form, or other document, is to be served.*"

123.   Mr Connell has explained that he was unable to find an email address or a working fax number for Cotor's registered agents in Panama. He therefore sent separate letters by post to Cotor's registered agent in Panama (who changed on 30th September 2016) 26th October, 31st October, 8th November and 25th November 2016 enclosing variously the PTR Order, W's Case of the Trust and W's counsels'

trial opening and authorities. No response was received from Cotor.

124. Panama is not a signatory to the Hague Service Convention (*i.e.* the Convention on the service abroad of judicial and extra-judicial documents in civil or commercial matters signed at the Hague on 15th November 1965).

125. R.6.43(3) does not prescribe one particular method of service, by merely that "*any method*" of service is permitted by local laws. Mr Connell contacted Panamanian lawyers and sought their advice on the appropriate method of serving documents in respect of foreign proceedings on Panamanian registered parties. Their advice was that the Panamanian Judicial Code has no rules that apply to foreign proceedings, and that there is no rule under that Code that positively prevents service by post on a Panamanian company's resident agent of documents relating to the foreign proceedings. It can therefore be inferred that service by post of documents concerning foreign proceedings is permitted by, and not contrary to, the laws of Panama. Accordingly, PHB served Cotor by post.

126. For these reasons, I am satisfied that Cotor was also properly served by post with the relevant orders and documents (see above).

*Order under FPR r.6.19*

127. FPR r. 6.19 provides as follows:

> "*(1) Where it appears to the court that there is a good reason to authorise service by a method or at a place not otherwise permitted by this Part, the court may direct that service is effected by an alternative method or at an alternative place.*
>
> *(2) On an application under this rule, the court may direct that steps already taken to bring the application form to the attention of the respondent by an alternative method or at an alternative place is good service.*"

128. The provisions of FPR r. 6.19(2) are similar to CPR r.6.15(2), which have been held to apply extra-territorially. In *Abela v Baadarani* [2013] 1 WLR 2043, the Supreme Court held that CPR r.6.15(2) applied both to service on foreign parties extra-territorially as it did to service on parties domestically, because *inter alia* "*such a power is to be implied generally into the rules governing service abroad*" ([20]), provided the actual method of service is not contrary to the local law ([24]). In my view, the same reasoning can be said to apply to FPR r. 6.19(2).

129. The Court has discretionary power to make a direction that service on H's solicitors of orders and documents amounts to a good alternative method of service on Cotor in this case. I am satisfied that it is appropriate, in all the circumstances, to make such a direction in this case, given my findings that Cotor is no more than H's nominee or bare trustee (see above). In my view, such a direction would serve the justice of this case.

130. Accordingly, I shall order and declare under FPR 6.19(2) that the steps already taken by W to bring these proceedings and the trial to the attention of Woodblade and Cotor by serving the relevant orders and documents on H through H's

32

solicitors in London constitute a good alternative method of service on Cotor in this case.

131. The service on Cotor on 25th October 2016 and 8th November 2016 are valid dates for the purposes of paragraph 4.4 of the prescribed annex for enforcement under the Lugano Convention

### (8)  LUGANO CONVENTION

*Enforcement under the Lugano Convention 2007*

132. W naturally wishes to be able to enforce any order which this Court makes against the Respondents. The Court is astute to ensure that its orders have effect and are obeyed.

133. W particularly wishes to be able to enforce any order which this Court makes against Cotor in Switzerland under the Lugano Convention. The Lugano Convention is, however, only concerned with maintenance and not the 'property consequences' of divorce (*Traversa v Freddi* [2011] 2 FLR 272). Accordingly, it is necessary to separate out from the award of the lump sum order those elements that constitute *"maintenance"* and those that comprise a share of the matrimonial assets. *"Maintenance"* is given a wide definition for the purpose of enforcement under the Convention (*Van den Boogaard v. Laumen* [1997] QB 759 ECJ).

*W's 'needs' and maintenance case*

134. W's 'Needs Calculation' is set out in a schedule comprising the following figures:

| | |
|---|---|
| (1) The purchase of an English Property (Eaton Square): | £ 39,268,750 |
| (2) The purchase of a Foreign Property (Cap Ferrat): | £ 27,885,630 |
| (3) A "Duxbury Fund" to meet W's capitalised future annual living needs (£5,359,354 *per annum*): | £157,101,608 |
| (4) Outstanding Professional Costs: | £     174,520 |
| | £224,430,508 |

135. W explained that she needs a house in London close to her sons and that H had previously tried to buy a suitable property in Eaton Square. W explained that she needs a villa in Cap Ferrat in the South of France close to *Villa le Cottage* so that she can see her sons during their vacations. W explained that her future income needs are £5,359,354 *per annum* comprising (a) her future income needs in England of £3,689,975 *per annum* and (a) her future income needs abroad of €1,671,379 *per annum*) which capitalised require a Duxbury Fund of £157,101,608. The total value of W's maintenance claim is, therefore, £224,430,508.

136. In the absence of any countervailing evidence, I find that these figures are justified on the evidence before me, given the lifestyle which to which she has become accustomed during her married life and leads. It is to be noted that H puts his current income needs at US$25 million *per annum* (see above). Accordingly, for the purposes of enforcement

33

under the Lugano Convention, I find that W's total *"maintenance"* claim requirements amount to £224,081,468.

## CONCLUSION AND ORDER

In conclusion, for the reasons set out in this judgment, I find and hold that the Claimant, Tatiana Akhmedova's claim for ancillary financial relief succeeds in the sum of £453,576,152, comprising 41.5% of the total marital assets.

137.  W already holds assets of £10,165,162 in value. I am going to order the transfer to her of the contents of Somerton House (£2,479,125), the Aston Martin (£350,000) and the Modern Art Collection (estimated value £90,581,865). Accordingly, to meet the balance, I order Farkhad Akhmedov to pay to Tatiana Akhmedova the sum of £350,000,000 (three hundred and fifty million Pounds sterling) and, for the reasons given in this judgment, Cotor shall be jointly and severally liable to pay this sum.

138.  I shall hear submissions from Counsel on the form of the Order.

34